I need help on this one. Norvel Lassere v. Michael Tigray and the St. John the Baptist Parish Sheriffs. And we have Mr. Frosch. Yes, Craig Frosch, Your Honor, on behalf of Sheriff Traig and the other sheriff deputies defendant. And I'm going to refer to him as Lassere. I'm not really sure. I wasn't, I don't know exactly how to pronounce her name. But what we have here, Your Honors, is an appeal of the denial of a Rule 50 motion for a judgment as a matter of law. The plaintiff presented their case. The magistrate judge who was presiding pursuant to 636 asked Fred Schroeder who was trial counsel for the sheriff defendants to essentially, as the witnesses were coming on to present his case during the plaintiff's case. So when the plaintiff rested, Fred made the motion for judgment as a matter of law. The magistrate judge said, well, I don't see how the motion could be denied, essentially. But he sent it to the jury. And the jury came back with a verdict against the sheriff defendants, basically finding them variously liable for a total of 50% of the fault and entered a damages award of $500,000, meaning the sheriff defendants would share variously the $250,000 for the reduction. We believe that, and then we re-urged our Rule 50 motion after the jury verdict was rendered and the order was entered. So we believe that it's properly before the trial. We rely primarily on the Rule 50 motion because that one, the court looks, this court would look at that on a de novo review using the same standard that the district court would use. And while there is some deference that is afforded to jury findings or evaluations of credibility, demeanor, et cetera, we submit to the court that in this case, on this record, there really was no demeanor findings. There really was no conflict in the testimony we submit for the jury or a finder of fact or the magistrate judge on the Rule 50 motion to find that there, that testimony should be, in the words of the, I believe the magistrate used these words, ignored. What we have is there was a traffic stop. Ms. LeSere, the decedent, was driving without her headlights on. It was early in the morning, the wee hours of the morning. One of the sheriff deputies saw her, followed her for a little while. When they approached a well-lighted area, he turned his lights on, pulled her over, and through the loudspeaker on his car, because of the time in the neighborhood, he asked her to step out of the car. She refused. He said, your lights, your lights are off. Another officer came for backup as they approached the vehicle. Ms. LeSere reached under her thigh and pulled out a gun and said, I'm going to shoot you. You're trying to kill me. I'm not getting out the car, etc., etc. Then they proceeded to, essentially, a low-speed chase. Other deputies followed in. They tried to cut her off. She drove around the vehicle. They tried to use spike strips to stop the vehicle. She drove around those. Eventually, she pulled into a driveway where there were several houses along this driveway off of River Road, and she stopped. The police came in behind her, got out of their vehicles, and started to engage her, asking her, you know, surrender, step out of the vehicle. We're not trying to hurt you. One of the officers engaged her primarily, and he tried to reason with her. He didn't have his weapon pulled. The other officers, who were staged sort of to the sides of the car and more to the rear, had their weapons drawn, because they knew that Ms. LeSere had a gun in her car. So, as this was going on, she was fidgety. Sometimes she would speak rationally. Sometimes she would just, again, blurt out, y'all are trying to kill me. Don't come near me. I've got, you know, I'll shoot you. At one point, she handed out her license. So, they had her license. They asked if there was somebody that the officers could call to maybe help mediate this thing. She gave them a phone number for her son, a cell phone number. Attempts were made to dial that phone number to make contact with the son, to no avail. After she handed out her license, she became, and the testimony is consistent, that she seemed to become a little more agitated. As she sat in her car, the officers tried to have her keep her hands on the steering wheel, so they could see her hands. Again, knowing she had a gun in the car and was irrational. So, she would occasionally take her hands down or move around in the car. The officers would put your hands on the steering wheel. We need to see your hands. After she handed out the license, she had one hand, her left hand on the steering wheel. She had her right hand on the headrest of the passenger seat. Now, this is where it gets a little bit hazy. What Deputy Daly, the officer who shot her, what he says, and the other deputies confirmed this, that she reached down to her right and then came up, turned to her left, and pointed with her right hand towards Deputy Daly. And he testifies, his testimony has been consistent, that when she turned to her left and came up, he saw what he thought was a gun in her hand. It's always, his testimony, the day of the incident, his statement given to the state police investigator, the testimony he gave years later at trial, it was all consistent. She reached down, she turned and came up, he thought there was a gun, so he shot her. Now, when was the window broken? That's, most of the testimony says that the window was broken before she reached down. At that point, after that license was handed out and they couldn't make the phone call, or they couldn't complete a phone call to get someone else out there, and it appearing that she was, the situation was deteriorating to the officers on the scene. The decision was made, one of the deputies suggested, hey, made a motion, I'm going to break the window, the rear window, on the driver's side. Now, was that, that was not communicated to any of the other officers? It was communicated between the lead officer, the lieutenant on the scene, who was doing the negotiations. Was, was he the shooter? He was not the shooter, but there was a pod, I'll call it a pod of deputies on the driver's side, and that included the lieutenant, Deputy Daley, who shot Sergeant Rell, who broke the window, and I believe there may have been one other officer in that grouping, and at that point, there was a ballistic shield that Sergeant Rell had been overholding because it's heavy, so they were behind the shield when the decision was made to break that window. But the decision was made only by the breaker, right? Well, it was made by the breaker with, the lieutenant said that he ordered the sergeant to break the window. The sergeant said, I signaled to the lieutenant that I'm going to break the window, and I guess there was tacit approval. What did the jury hear about signaled? It's, it's in the testimony. It's, not only is it in the testimony, but it's also, the state police report on the incident included statements that were given by all of the officers involved, and I think two or three independent witnesses. And in, and that was submitted as a joint exhibit, so that was in the evidence, submitted into evidence. So in those statements, and I believe in the testimony, that came forward, so the jury heard that. And, so Deputy Daly doesn't attribute her motions to the breaking of the glass. I think one or two, one deputy may have said it was almost simultaneous. As she reached down, the glass was broken. There was no testimony given that her reaction appeared to be a reaction to the glass breaking. Deputy Pearson, who was on the passenger side of the car, said before she put her hand down, she looked rearward toward Deputy Pearson's position, and then suddenly reached down and turned. All of the deputies' testimony was consistent with that, that she reached down and came up turning. Deputy Pearson is the deputy who yelled, gun, she's got a gun. And she did that when Ms. LeSere reached down and came up. And that's, that's clear in the testimony. There's no testimony, and there's no evidence to contradict that, that Ms. LeSere can't reach down and turn. What the magistrate seized upon, and we think it's an incorrect reference or an incorrect conclusion, from the autopsy report, which was also included with the state police report, the wounds that Ms. LeSere suffered were all on the left side, which is consistent with her having turned to face Deputy Daley. There was one in the left side of the buttocks. There was one that hit her elbow, her left elbow. There was one that entered on the left side, traversed the chest, and exited below the right breast. So all of that is, the magistrate judge said that's inconsistent with Deputy Daley's testimony. That's inconsistent with the other deputy's testimony that Ms. LeSere had turned. And we submit it's physics. That is not, that does not contradict the deputy's testimony. And he seized upon that fact to say I'm going to discount, I'm going to ignore what Deputy Daley said because the physical evidence doesn't support it. It contradicts him. Well, the jury heard that, right? The jury heard what, in the testimony that was given by the state trooper who conducted the investigation, was that her wounds, from the autopsy report, were on the left side and were consistent with what Deputy Daley said happened. And basically what all the other deputies had said, that she reached down and turned. Very suddenly, very abruptly, turned. Another thing that the magistrate judge seized on was all of the deputies, except for Deputy Daley, said they heard what they thought was a gunshot, single gunshot, then a slight pause, and then a series of gunshots. Deputy Daley's testimony did not have that. Deputy Daley's statements the night of the shooting did not include that information. But all of the other deputies were consistent that they heard something that they referred to, I believe, as a muffled pop. Then there was a pause, and then a series of shots. And the presumption is that that first pop was Ms. LeSere shooting her weapon. And the magistrate judge said, well, that's inconsistent with what Deputy Daley said, because he didn't say anything about that first pop. He didn't say that Ms. LeSere shot. Was there any investigation of whether her gun had been fired? There was. They took gunshot residue kit from her hands. They took her fingernail clippings during the autopsy, but those were never tested by the state police. There was one, she had a revolver, and there was one fired round, or a shell, in the revolver. So there were five unspent rounds, and there was one bullet that had been fired from her gun. Was it in the firing position of the cylinder? There was no testimony as to which cylinder it was in. Was it common to keep a spent one in the barrel part of the gun? Well, the shell was in the cylinder. But one lines up with the barrel. Right. It's common to leave either that no cartridge in there, or a spent cartridge, because it makes the revolver safer. Right. And there was no testimony as to what position the cartridges were in the revolver. And there were ballistic tests performed, but the fragments that were found in the vehicle were apparently so mangled that they couldn't make an analysis or a comparison or a match to any of the guns, or the two guns that were used. I mean, they matched some of the bullets to Deputy Daly's gun, but the unexplained fragments were never matched to either gun, because they were just too mangled. I have reserved time for rebuttal, so I'll see you next time. Thank you. Mr. Root. Good morning, Your Honor. May it please the Court, Counsel. My esteemed colleague was not there at the trial, and so it's a slight disadvantage, but I have to tell you that I do not at all agree with the contention that there was very little conflicting testimony. You were at the trial. Yes, sir. It was an amazing trial in one sense, in that I have never seen more blatant evidence of a fabricated cover-up of a bad shoot than this instance was. It was just an amazing display when Sandy Crane got on the stand to talk about his investigative report of this incident, because it included things like Ms. LeSere shot at the officers. Well, not a single officer that day, and this is at night, 2 in the morning this is happening, 140, no one contemporaneously mentions that there was a shot, a muzzle blast, anyone smelled gun smoke. It's unusual in that all of the officers testified right afterwards they gave recorded statements. Those recorded statements were all in the trial, and that led, to a certain extent, to this sort of interesting conversation in the J-Mall hearing where the magistrate's not exactly sure the strength of our case, and there's questions that are made of Mr. Schroeder, and I'm trying to say, well, in the report we have a DNA report where this sweating, sobbing woman has no DNA from the gun. Her DNA's on the gun. They did that report. That's in evidence, and he goes, show me where. I say, well, her relatives were right next door. They couldn't find anyone to talk to her or to locate her son, and they're right next door. Where's that? That's in the report. So it's actually in the excerpts from Appellant where Mr. Schroeder says, Your Honor, very few questions were asked of my officers. There's all of this information that's in the record that is coming in, and the magistrate says, well, of course it is, because you never objected, and it's in the joint exhibit book, and the things that are contained in that book are things like no GSR testing, no gun smelt residue testing at all of the car. They'd swabbed her fingers, and they got her fingernails, and they never tested it. Supposedly, she shot out the window, and there's a hole in the window that one of the officers managed to magically see that it's a slightly different diameter than the bullets we use, but I had to bust the window, even though there's another busted window already busted to get her out, which seems completely ridiculous, but then you find out in the report, they quote two other officers as seeing that hole, and you ask them, and in their statement, they don't mention it, and they don't mention it at trial. In fact, the one officer, Michelle Phillips, says that, in fact, that there's no tint on the car. Completely says something opposite. And this whole thing about how she was shot is not consistent with the testimony. She was shot in the back. They say she took a gun and turned toward the officer. In fact, there's sort of this anti-Oakley thing where you shoot over your shoulder, where you point your back to the officer while you shoot him, where if she's going to shoot him, she's going to take her gun and turn and shoot him. Logically, that would occur. But Officer Daly, who shot her, also invents a story of he saw the gun on top of the seat. Well, his own fellow officer says that they found the gun that was never seen on her presence at any time while they were at the house, at any point that she pulled it out or anyone knew where it was. It wound up being stuck between the door and the seat, facing the trunk. And the officer said in the materials, which is actually the statements... The door and the... The door and the seat. Passenger seat. The passenger seat, Your Honor. Yeah, passenger seat. Facing the trunk. And that officer specifically said, I never heard any thunk. I think it was always there. It wasn't on top of a blanket or anything because they asked him that. So really, the only person who's saying these things about she's turned and she has the gun in her hand is the officer who shot her in the back. And to set the scene, Your Honors, this is a man behind a ballistic shield, a bulletproof shield with a flashlight looking at her. The deputy that's to the right, Michelle, says that right before it happened, she said, told him, I can see your hands. I can see your hands. They have flashlights. She has a flashlight. Nobody thinks she has a gun. They've never seen a gun the entire 18 minutes that she's been there. But the one thing they have going for them is that they're safe behind a shield with a weapon. But what they do when you yell gun when there is no gun, when you smash the glass next to the head of a woman who tells them, I think... You said there was no gun, but there was. Oh, there was... They had seen a gun previously. Absolutely, Your Honor. There is a threat. And we're not saying there's no threat, absolutely. But when you have a situation like this where you have a woman who, for whatever reason, is acting irrationally, that's when you don't need to bash the window next to her head. When she thinks you want to kill her, then suddenly you smash the window. It's like if there was a bomb that would go off if she moved. And so then your response to that is, well, we'll bash the window and make sure she moves. It's literally a death sentence to have a person with a gun standing there a foot from her and yell gun as if she has one when she doesn't when you know she's going to move if you bash in the window next to her head. That is the unreasonable nature, the negligence case as opposed to a 1983 case. And that's the whole... The different fabric of finding out what's reasonable because in that moment-of-shoot doctrine that we have in 1983 under qualified immunity, you don't really go beyond, did the officer think he was threatened? But the moment-of-shoot doctrine has no place in Louisiana 2315. We can step back and look at, how did you get to this point where the officer thought that he was threatened? And how that occurs is when you have essentially no idea what to do in this situation because we asked, I asked Deputy Daley, well, do you have any procedures about dealing with people who are emotionally stressed? No. Well, do you have any procedures on what to do if someone's barricaded? No. Well, do you have a SWAT unit? Well, I think we have an emergency crisis unit. How are they different than SWAT? I don't know. What do you call them? I don't know. I mean, they did not know. And so after about 15 minutes of this lady clearly not responding, they just got mad. And the eyewitnesses, the neutral witnesses, who were in the house next door saw the officers get madder and madder and then start screaming at her. And the saddest part was where they're saying that they're screaming, hands on your head, hands on the wheel, hands on your head. And she couldn't comply with the conflicting commands and started sobbing and rocking back and forth in her seat. And this is when they got the great idea to bust out the window. But it's important for the court to know that the officer who busted it out said, hours after the event, I busted out the window to let the canine dog in. And then the lieutenant said, oh, no, no. I said let's bust out the window so we can extract her. So I don't know which one of them from the car. From the back window? From the back window, apparently. So the woman who is terrified of you is going to let you smash in the window and somehow reach in and grab her out while she stays still because there's apparently a gun in the car. That is not reasonable. If the protection of her life and her safety of this person who is struggling with something that thinks you want to kill her, that either putting in a dog in the car, because even though they say, no, that wasn't our intention, that's what he said after the event. The person who broke the window said, I knew I wanted to do something, so I looked at Lieutenant Remondee and said, I'm going to bust the window to put my dog in. That's what he said hours after the event. Maybe that wasn't true, but that's what he said. So we have the lieutenant giving aversion and we have the sergeant giving aversion, but what is clear is that they bashed the window next to her head and she moved. Now, the appellate says she reached for the gun. We say she ducked away from a crashing window behind her head that no one knew was coming because you're right, Your Honor, no one told anybody that this was about to happen other than, I guess, this nod and wink to each other, the two officers, Lieutenant Remondee and Daly, and at this point, I'm sorry, Rel, and at this point you have behind the bulletproof shield, just feet from this lady, you have Deputy Daly with his gun, with a flashlight, looking at her, and at this point her hands are up. Is there evidence in the record that the movement that she made was made after the window was broken? Yes, Your Honor, in that nobody says she moved until the window was broken. What the appellate says is that she turned and fired after the window was broken. Well, that's really just her moving, an excuse for why you shot her. Everyone agrees that there was no movement until that event that broke the glass, and so at that point it's reasonable to assume that this confused lady is going to move, and so the question then, when you look at the factors, is there an exigent reason why at that moment we had to do that? It's been 15, 18 minutes. Why the heck can't we wait her out a bit? We're trying to find relatives. We're trying to calm her down. Instead of screaming at her because you're getting frustrated because she's not following your commands, take a gentle tone. Take as much time as you want. She's obviously crying, but she'll need to use the restroom. She'll want to eventually maybe go in. If you tell her, well, if you get out of the car, you can go, but there was no reason other than they said, well, we thought there was no need to go further. They never defined what this great reason was to bash in the window next to her head. What is the necessity to do that when they just could have waited this thing out? And that's the lack of reasonableness, and also the fact that when you know someone will move if they're startled by the window bashing in, and you know we have some officer on the other side of the car who is not going to know this is coming, that something might happen. In this case, even though the deputy never saw a gun in her hand at any point once she stopped her car, even though she said she could see her hands prior to the quick move event, she says today, I can see your hands. That's okay, Steve. What we have then is suddenly she moves, and instead of saying she's moving, she says gun. Well, she admitted on the stand, I never saw a gun in her hand. I never saw her pick up a gun. I never saw a gun in the car at any point. I mean, this is the deputy who said gun. I never saw one. But when she yelled gun, then the officer with the bulletproof shield starts firing, and he shot her through the back, and it went through her heart, and she died. And our contention is that it certainly was negligent on the part of this lady not to comply, although she certainly will never know why she was acting the weird way she was acting because we looked for medical records everywhere trying to show some sort of mental illness. The defendants did, and we couldn't find any organic reason. Her medical reports are in. She wasn't on drugs. She wasn't drunk. She just had this unexplainable belief that the officers wanted to kill her, and we think that she's the perfect person who needs even more than a normal person, the restraint of an officer, reasonableness in not accelerating the situation until you get to the point where bad things will happen because bad things will happen when your officers are surrounding you with guns pointing at you, and someone screams gun, or someone moves quickly. And it's foreseeable that bad things will happen if there's no need for them to do that movement, and there was no need at the time for them to make that decision to bash in the window. And the record is absent of any good reason why they did that other than on the stand, Lieutenant Rubin, when they said, well, I think we've given up. I don't think we're going to get anywhere further with her. Well, that's not a reason to do something that can kill her because you're essentially annoyed that she's not responding quick enough. 15 to 18 minutes in a... It's not a hostage situation because she's by herself, but 15 to 18 minutes in a lady sitting in her own car in front of a house where she's living with her niece, does it rise to the level of, this is our last gaffe, let's go with something that can induce deadly force? There's nothing in the record to say that that's why they had to do it at that point. And we think that's why, Your Honours, the jury believed that there was 50% negligence in that certainly you can't say that Ms. Lacerre wasn't negligent in not responding to the officer's commands, but there was no need to do the thing that they did exactly when they did it. This chase they talked about, I don't know if Your Honours saw, but it was a 10-mile-per-hour chase, if you want to use the word chase. She drove slowly from the place she was stopped to her house. There was no evidence that she was a threat. She was going to run over somebody. She was acting that sort of crazy or that sort of threat in the chase department. And so when she got there, they were surrounded by... First they had the dog out, then they put the dog back in, but there were certainly at least two officers to the right of her, there were three officers, including the lieutenant and the sergeant to the left of her, there were officers in back of her. She was, for all effects, surrounded because she couldn't go through the front windshield. And so at that point, everyone is safe. She's not pointing a gun, there's no gun in her hand. If the gun is where we think it is, it's actually over on the passenger side between the floorboard, I mean between the seat and the side door, facing the other way, she'd have to scramble to find it. But there's no reason to do anything but try to wait this out, try to talk to her more. Because the important thing was, Judge, when they were talking to her like a person, when they were trying to be nice, she was responding. Here's my son's telephone number. And they called the son, and he'll never live... You know, he'll never be so guilty if he didn't answer the phone and never got the call and didn't talk to him. But they could have waited to keep calling. The people who watched outside the window, Miss Dennis and Miss Turner, said that she was responding and she gave them a licence. These are all things that aren't too awful, threatening. But then they just got fed up that she wasn't responding, and the tone changed, and then they started screaming. And then we had the alternate commands she couldn't follow, and that was the point where suddenly she started rocking back and forth and crying, and then they busted the window. And so we think a reasonable juror could conclude that there was an alternate way they could have handled this situation that could have resulted with her not being dead from a gunshot, because someone didn't bash in the window when there was no need to do it, or at least they could have told people it was going to happen, so then they would have some notice. And lastly, I don't want to minimise the threat to officers because they do a wonderful job, and obviously a person with a gun is always a threat. Having said that, the man who shot, who was the only person she was going to turn and, under their theory, turn and fire at, was behind a ballistic shield. We think that you should at least, someone should verify that she had a gun in her hand before they yelled, gun, and they shouldn't have shot her and killed her when there was a way just to wait her out. And we think it's certainly 50-50 comparative fault. It's not an unreasonable decision based on what they heard. I'm trying to think of what my opposing counsel said about the actual run-up to the event. And quite honestly, we have nothing to say that didn't happen exactly as they say the initial stop happened, and we're not arguing that they did anything wrong in the initial stop. Of course you check someone without their lights out. We're not arguing that you shouldn't follow and find out what some lady's doing if she pulls a gun. That's all appropriate. Nothing's wrong. But when you follow her to the place where she lived and she pulled out her licence and they told her, well, you don't live here. Well, actually, she was moving there with her niece. They never bothered to check next door to see who was living there. I guess they just assumed she was lying, although maybe if she was in a Mercedes and more eloquent, they would have said, well, I guess we can check and ask. But in her case, they just told her, you don't live there. This doesn't match, as if people's licences always match. So then they decided, we want you to leave the car. And she wouldn't leave the car because she kept saying, you're going to kill me. Now, it may be irrational, but police officers, in the normal course of their day, have to come across some people who are acting irrationally. And part of their duty is to make sure that these people acting irrationally are treated with the best possible way to make sure they're safe. Part of the record is Exhibit 7 and Exhibit 6, the joint records. One of them is the canine policy. It's like 11 pages. You look at No. 6, Your Honours, it's the excessive force policy. It's like a paragraph. We think there should be at least as much how to deal with someone in a crisis situation as there is on how to take care of a dog. They should tell you when you need to get the emergency crisis group in. They should tell you how to deal with someone who's not responding. They should tell you what to do when someone's barricaded in the car. They honestly didn't know. And we think that the absence of training, what they admit to, and the lack of knowing what to do all falls under the other rubrics of the seven factors of alternate means of arrest. If you don't know what to do as an alternate means of arrest, then it's going to turn out like this, this horrible tragedy. So we think the court should also consider the fact that they admitted that at least Deputy Danny says, I really don't know anything about barricades or emotional people or much about excessive force. I can't tell you, but I shot her because she turned. Although he didn't say there was a gunfire hours after the event. He never mentioned a single thing about it. Not one officer mentioned a snub-nosed revolver in the dark with a muzzle blast. Nobody saw it. Nobody smelled smoke. They didn't bother to GSR test the car or the window or put the window back together or take any swabs of any area other than her hands, and then they never tested them. And goodness knows I'm biased, Your Honors, but it seems to me a good reason in a death case with forensic evidence and GSR testing not to test it is because you know the answer in advance. It's not going to find anything. So it's better for the report not to mention it and just say, well, she shot Adam, and that will make things go away. But the family then was unhappy and decided to bring suit, and so now we know more about what happened in that official report. Unless you have any other further questions, Your Honor, I think I'm about close on my time. Thank you, Your Honors. Thank you. One of the things that was mentioned, you know, that the officers should treat this situation in the best possible way, that's not the standard. That's not the standard. Clearly under Louisiana law, in such cases, there's a zone of reasonableness. If the actions taken by the officers are reasonable, whether it's at the lower end of the scale, the upper end of the scale, whether or not there are other alternatives, if it's in that zone of reasonableness, then they're okay. They cannot be liable, and we submit that under the facts of this case, their actions fell within that zone of reasonableness. The relatives next door, there was testimony that she was going to be staying with a niece who lived next door. The testimony at trial from the lieutenant was that she said, I live right here, and he said, Is anybody in the house? And she said, No. Okay, so there's nobody in the house. He didn't say, I'm going to be living with my niece. She may be there. She's out of town or whatever. She said, No, there's nobody there. I think, Judge, you identified this as well, that they knew there was a gun. She was in constant surveillance since the time she brandished that weapon until the time that they removed her from the vehicle. She never threw the gun out of the window. She never ditched the gun. So they knew there was a gun in that car. The position of the gun after the shooting, the testimony was consistent that after she was shot, she fell to the right, that her arm was on the seat. One of the officers said he saw the gun on the seat. One of them, the person that retrieved it, said it was between the seat and the door. So clearly that as she fell, she could have dropped that weapon. It could have ended up in any number of different positions when she fell. So the fact that it was between the seat and the door does not mean she didn't have a gun in her hand. It could very possibly be that she had the gun, and when she fell, that's where it ended up. Deputy Daley did say he did not hear a gunshot. But again, I'll reiterate, look at the joint exhibit and you look at the testimony. All of the other deputies, and even I think there were two independent witnesses, said they heard a pop and then a pop, pop, pop, pop. So it could be reasonable for the state police officer to, say, extrapolate from that. Well, there was a gunshot and then Deputy Daley shot, but Deputy Daley didn't hear the shot. And the state police trooper said sometimes that happens in the middle of this kind of situation where you're so intense in observing the subject that you may not hear the gunshot. And Deputy Daley said, I shot because I saw what I thought was a gun in her right hand as she turned toward me. And yes, he was behind a ballistic shield, but Sergeant Rell was not. His testimony was, I broke the window. My service weapon was in my holster. So as she reached down, I backed up to find some safety. So he was exposed. The lieutenant was in and out from behind the shield at the time. So there were other officers who were placed at risk. The cases we've cited demonstrate that an officer does not have to wait for a subject to shoot their weapon. If he believes he's in grave danger and he believes he sees a weapon in her hand, he can shoot. And that's what Deputy Daley said. He didn't say, I saw a shot. He didn't say, I heard a shot. I shot because I saw a gun or what I thought was a gun in her hand. What is the standard? What is the question? What is the fact question that was asked to the jury? What is the legal standard by which we measure all of this? Well, the legal standard is you're using state law. And, again, we submit under the Matthau case and the Stroit case, it's a standard of reasonableness, a shifting scale of reasonableness. Now, within that, you also have the Kyle factors, which are those seven factors that no one is determinative. It's basically a totality of the circumstances test to determine whether or not the officer acted reasonably. If you look at the individual officers, the sergeant who yelled gun, she knew there was a gun in the car. She knew it was on the right side. She saw her reach down and turn, so she said gun. Deputy Daley didn't shoot because she said gun. He shot because he saw what he thought was a gun in her hand. The deputy that broke the window. A woman is not cooperative. You say 18 minutes, but you've got to start at the initial stop. At any point in this process, she could have stopped, surrendered, and stopped this whole process. She didn't do that. So it's not just 18 minutes. You've got to expand that. And it appeared that she was becoming more agitated, more recalcitrant, so what they were trying to do was get her out of that car to diffuse the situation. They had to get entry into the car. They had to get her away from that gun. And that's what they did. Thank you. Thank you both. That concludes this panel.